NO. 24-1576

# In the United States Court of Appeals
# For the Fourth Circuit

**AMY BRYANT, M.D.,**
*Plaintiff-Appellee,*

v.

**TIMOTHY K. MOORE, PHILIP E. BERGER,**
*Intervenors/Defendant-Appellants,*

and

**JEFFREY N. JACKSON,**
IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL FOR THE STATE
OF NORTH CAROLINA
*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION
NO. 1:23-cv-00077-CCE-LPA

BRIEF OF AMICUS CURIAE
**TAYLOR MORGAN DANT**
IN SUPPORT OF PLAINTIFF-APPELLEE

Taylor M. Dant, esq.                         ***AMICUS CURIAE***
1198 Pleasant Ridge Rd.,
Greensboro, North Carolina 27409
td@dantlegal.com
719-640-8493

TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................3

SUMMARY OF ARGUMENT AND INTEREST OF AMICUS CURIAE ...........4

ARGUMENT .................................................................................................5

A. NORTH CAROLINA ABORTION LAWS ARE PREEMPTED. .....................6

    I.   Conflict Preemption. ......................................................................7

    II.  Field Preemption. .........................................................................9

B. GENUINE FRIEND OF THE COURT............................................................11

CONCLUSION .............................................................................................13

CERTIFICATE OF COMPLIANCE ....................................................................15

CERTIFICATE OF SERVICE.............................................................................16

TABLE OF AUTHORITIES

**Cases**

*Dobbs v. Jackson Women's Health Organization,* 597 U.S. 215 (2022)................11

*English v. General Electric Company,* 496 U.S. 72 (1990) .....................................7

*GenBioPro v. Raynes,* 144 F.4th 258 (4th Cir. 2025). ..............................................5

*Hines v. Davidowitz,* 312 U.S. 52 (1941)...................................................................8

*Roe v. Wade,* 410 U.S. 113 (1973) ...........................................................................11

*Va. Uranium Inc., v. Warren,* 587 U.S. 761 (2010) ...................................................9

**Statutes**

21 U.S.C. § 355-1(a)(1)...............................................................................................9

**Other Authorities**

*In re: Taylor Dant,* 25-1671 (4th Cir. August 5, 2024). .........................................11

N.C.G.S. § 14-23.1 ......................................................................................................6

N.C.G.S. § 90-21.81(1a)..............................................................................................5

**SUMMARY OF ARGUMENT AND INTEREST OF AMICUS CURIAE**

Intervenors/Defendant-Appellants, as legislators, advance the position that regulation of abortion is a matter traditionally reserved to the States as part of their authority to protect the health and safety of their citizens. Plaintiff-Appellee Dr. Amy Bryant, a physician practicing in Orange County, North Carolina, is certified to prescribe mifepristone under the federal REMS. This appeal is a cross appeal, where Plaintiff-Appellee challenges North Carolina's restrictions on that medication, asserting that those restrictions prevent her from providing care consistent with federal requirements and her professional medical judgment. Both positions present important considerations regarding the respective roles of state authority and federally regulated medical practice.

Taylor Morgan Dant is a civil rights attorney admitted to practice in multiple federal courts, including this Honorable Court. *Amicus Curiae*, Taylor Morgan Dant, ("Amicus Dant") is impacted by the Order appealed to this case by the Honorable Judge Eagles of the United States District Court for the Middle District of North Carolina as she is a female with the ability to become pregnant, or could have been pregnant, in the timeline of events related to this appeal. In this case, Judge Eagles Ordered state law preempted by federal law, allowing non-physician treatment in North Carolina. Less than one year later, a similar order impacting Amicus Dant was entered by the same Judge, allowing non-physician diagnosis in support of state

4

regulatory power. When read together, these Orders, one year apart, bear on the relationship between state regulatory authority and the provision of care involving FDA-regulated medications. Those rulings, including the determination that individuals who are <u>not</u> North Carolina physicians may, in certain circumstances, engage in activities related to the diagnosis and treatment of medical conditions involving such drugs, raise questions with broader implications beyond the parties to this case.

Pursuant to Federal Rules of Appellate Procedure, Rule 29, Amicus Dant prepares this Brief in support of Plaintiff-Appellee Amy Bryant, in support of a licensed medical professionals judgment, the law, the protection of women, and the United States Constitution. Amicus Dant asks this Court to Reverse Judge Eagles decision, and remand with further instruction of this Court, preempting North Carolina's restrictions on "Abortion Inducing Drugs" in compliance with its decision in *GenBioPro v. Raynes,* 144 F.4th 258 (4th Cir. 2025).

## ARGUMENT

Unlike the statutory scheme at issue in *GenBioPro*, North Carolina does not regulate the termination of pregnancy as a medical procedure or the safe administration of drugs. Instead, it regulates "death."

5

A. NORTH CAROLINA ABORTION LAWS ARE PREEMPTED.

North Carolina defines an "Abortion-Inducing Drug" as "[a] medicine, drug, or any other substance prescribed or dispensed with the intent of terminating the clinically diagnosable pregnancy of a woman, with knowledge that the termination will, with reasonable likelihood, cause the *death* of the *unborn child*." N.C.G.S. § 90-21.81(1a) (*emphasis* added). If liability under North Carolina law turns on a physician's "knowledge" that a drug will "cause the death of the unborn child," then the statute necessarily defines the regulated act by reference to death, not by reference to medical treatment or drug safety.

North Carolina's definition of an "unborn child" confirms that conclusion. An "unborn child" "means a member of the species homo sapiens, at any stage of development, who is carried in the womb." N.C.G.S. § 14-23.1 ("Unborn *Victims*")(*emphasis* added). If an "unborn child" is defined as a human being "at any stage of development," then the statutory scheme assigns the legal consequence of "death" to the termination of pregnancy at any point once that definition applies. If the statutory text defines the regulated act as the causation of "death" to a legally defined "unborn child," then, under the same *prima facie* interpretive approach this Court applied in *GenBioPro*, the statute must be read according to that plain meaning. Because this Court has already recognized that "the statute means exactly what it says." *GenBioPro, Inc. v. Raynes*, 26, 45 (4th Cir. July 15, 2025), it would

6

follow North Carolina's statutory "Definitions" to its Abortion Law does as well. Although the district court correctly identified federal preemption concerns, its reasoning does not fully account for the statutory conflict presented here; the North Carolina Abortion Statute(s) regulating Abortion Inducing Drugs are preempted by federal law, but not for the reasons Judge Eagles determined.

I.      Conflict Preemption.

Starting with conflict preemption, in according with *GenBioPro,* " '[t]here are two types of conflict preemption. The first arises when it is impossible for a private party to comply with both state and federal requirements.'" *Id.* at 23 (*quoting English v. General Electric Company,* 496 U.S. 72, 79 (1990)). The first conflict preemption is met under the analysis herein. If federal law governs the safe access, prescribing, and distribution of REMS drugs, then a physician complies with federal law by prescribing abortion-inducing medication in accordance with FDA requirements. If North Carolina law conditions that same act on a physician's "knowledge" that the drug will "cause the death of the unborn child," N.C.G.S. § 90-21.81(1a), then compliance with state law requires the physician to adopt and act upon that legal characterization. If federal law treats the administration of the drug as lawful medical treatment subject to safety regulation, while state law defines the same act in terms of the causation of "death" to a legally defined person, then the physician must simultaneously characterize the same conduct in two incompatible ways.

If a physician can not both comply with federal requirements governing safe access to medication and, at the same time, satisfy a state requirement that assigns liability based on an undefined and legally imposed concept of "death," then dual compliance is not possible. If dual compliance is not possible at the point of prescribing the medication, then the first form of conflict preemption is satisfied. Accordingly, where compliance with federal law necessarily places a physician in violation of North Carolina's statutory framework, and compliance with state law requires departure from federally governed standards, the state law is preempted under principles of impossibility.

The second type of conflict preemption occurs when " 'state law []stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (*quoting English,* 496 U.S. 72, 79 (1990) *see also Hines v. Davidowitz,* 312 U.S. 52, 67 (1941)). If Congress, through the REMS framework, has established a system to ensure safe access to drugs with known risks, then the federal objective is not prohibition, instead it is controlled availability under uniform safety standards. If North Carolina defines the use of an "Abortion Inducing Drug" by reference to a physician's knowledge that it will "cause the death of the unborn child," N.C.G.S. § 90-21.81(1a), then the State assigns a legal characterization that reframes access to the drug as inherently unsafe. This Court did not find Congress intended to guarantee nationwide access to mifepristone, it authorized minimum

8

safety standards. *GenBioPro,* at 23, 45. If the federal scheme permits access subject to safety restrictions, while the state scheme conditions that same access on a characterization that imposes liability tied to "death," then the state law alters the balance Congress struck between *risk* and *availability.* Essentially, North Carolina regulates the availability of 'Abortion Inducing Drugs' in accordance with Congressional intent, but it conditions that availability on legally defining the drug as *not safe.*

If a state law redefines the federally regulated use of a drug in a manner that discourages, burdens, or functionally restricts access beyond the limits set by federal law, then it interferes with the method by which Congress chose to achieve its objective of Congressional intent "necessary to ensure that the benefits of the drug outweigh the risks." 21 U.S.C. § 355-1(a)(1). If the state law interferes with that method, then it stands as an obstacle to the accomplishment and execution of Congress's full purposes and objectives. Accordingly, North Carolina's statutory framework governing "Abortion-inducing drugs" is preempted under principles of obstacle conflict preemption.

II.    Field Preemption.

This Court ruled "'state law regulating an upstream activity [like abortion] within the State's authority is not preempted simply because a downstream activity [like medication safety] falls within a federally occupied field.'" *GenBioPro,* at 19, 45

(*quoting Va. Uranium Inc., v. Warren,* 587 U.S. 761, 790-91 (2010). If North Carolina were regulating abortion as an upstream medical procedure, then its exercise of authority could remain distinct from the federally occupied field governing drug safety. If, however, North Carolina defines an "Abortion Inducing Drug" by reference to its use and legal consequence, and conditions liability on a physician's prescription and administration of that drug, N.C.G.S. § 90-21.81(1a), then the statute operates directly on the use of the medication itself. If a state law operates on the prescription, distribution, and use of a drug, then it regulates the same subject matter as the federal scheme governing that drug's safety and access.

If the State's regulation turns not on the independent medical procedure, but on the characteristics, use, and effects of the drug as defined by statute, then the law is no longer confined to an upstream activity. If the law is not confined to an upstream activity, but instead intrudes into the regulation of drug use and access, then it enters the federally occupied field. Thus, where North Carolina's statutory framework regulates abortion-inducing drugs in a manner that governs their use, characterization, and legal consequences, the upstream/downstream distinction does not apply, and the statute is preempted under principles of field preemption. Accordingly, North Carolina's Abortion Statutes, as argued by Plaintiff Appellee Amy Bryant, are preempted under field preemption.

10

B. GENUINE FRIEND OF THE COURT.

Amicus appears to provide a limited perspective not fully represented by the parties: the practical and institutional effects of the statutory and judicial framework at issue when applied beyond a single case. Amicus does not seek to relitigate any separate matter, but to assist the Court in evaluating the broader implications of the issues presented here. First, the two orders of Judge Eagles in a time frame of one year permits non-physicians to engage in activities related to the diagnosis or treatment of medical conditions; often, those involve federally regulated drugs. In Amicus Dant's context, separate, but related, non-medical actors may also characterize or assess professional conduct using terms grounded in medical or psychological concepts; then, criminalize or professionally "standardize" the police power of the state. *In re: Taylor Dant,* 25-1671 (August 5, 2024). This Court should consider whether the same framework in Amicus Curiae's Order from Judge Eagles, and the Judge Eagles Order Cross-Appealed herein expands authority in one context; namely, the diagnosis and treatment of medical conditions by the police power of the state of North Carolina, while constraining licensed professionals in the context of professional regulation without a consistent limiting principle.

Further, Defendant-Appellants arguments for State's Rights to regulate the health and safety of its citizens is an honorable position to this Court, and it comports with *Dobbs v. Jackson Women's Health Organization,* 597 U.S. 215 (2022). But

11

what happens when the state politically-police health and safety, instead of regulating it? *Dobbs,* overturned *Roe,* which stood for forty-nine years. *Roe v. Wade,* 410 U.S. 113 (1973). *Roe* determined women held the constitutional right to autonomy over their body; and privacy under the Ninth Amendment to the United States Constitution, as enumerated through the Fourteenth Amendment to the United States Constitution, and applied to the States through the Fifth Amendment Right to the United States Constitution. The Honorable Judge Ginsburg remarked on *Roe,* stating

> **"'[m]y criticism of *Roe* is that it seemed to have stopped the momentum on the side of change,' Ginsburg said. She would've preferred that abortion rights be secured more gradually, in a process that included state legislatures and the courts, she added. Ginsburg also was troubled that the focus on *Roe* was on a right to privacy, rather than women's rights. '*Roe* isn't really about the woman's choice, is it? [. . .] It's about the doctor's freedom to practice…it wasn't woman-centered, it was physician-centered.'"[1]**

The question to this Court is: is there room here, for both? It is the states' right to regulate the practice of medicine; but when that right intrudes on women's rights, physicians rights to practice medicine; attorneys rights to practice law, and states' rights to limit the practice of medicine to medical professionals, who wins?

---

[1] Heagney, Meredith, <u>Justice Ruth Bader Ginsburg Offers Critique of *Roe v. Wade* During Law School Visit</u>, *Roe v. Wade at 40: A Conversation with Supreme Court Justice Ruth Bader Ginsburg,* The University of Chicago, The Law School (May 11, 2013). https://www.law.uchicago.edu/news/justice-ruth-bader-ginsburg-offers-critique-roe-v-wade-during-law-school-visit

**CONCLUSION**

What is before this Court is not simply a question of doctrine and a re-litigation of "states' rights," v. "right to abortion." Instead, it is a question of coherence in the law and restraint in its application. When the same framework permits the expansion of state power into areas traditionally reserved for licensed medical judgment, while simultaneously restricting the ability of licensed professionals to act within their fields, the scales no longer tip toward justice; they weigh instead toward the policing of women. A system that allows non-physicians to influence or define medical conclusions, while placing heightened burdens on those trained and authorized to provide care, risks untethering regulation from its stated purpose of protecting health and safety.

Amicus does not suggest that the State lacks authority. Rather, the concern is what occurs when that authority is exercised without a consistent limiting principle. If the State may characterize medical treatment in terms that impose liability untethered to federal standards, and if it may rely on non-medical determinations to influence outcomes in both healthcare and professional regulation, then the structure designed to safeguard both patients and practitioners begins to erode. At that point, regulation operates as a machine; producing uncertainty, inconsistency, and, ultimately, inequity against the most vulnerable public. This Court has the opportunity to clarify that boundary. Not by diminishing the role of the State, and

13

not by elevating one set of rights at the expense of another, but by reaffirming that when federal law governs the safety, access, and administration of medication, and when professional judgment is exercised within that framework, the line must hold. Without that clarity, the consequences extend beyond this case, reaching into the integrity of medical decision-making, the stability of professional regulation, and the lived realities of those subject to both.

Amicus has lived the reality of both Orders rendered by Judge Eagles, in both contexts, and both by non-medical professionals. Namely, in the matter of one year, decisions around non-medical professionals in favor of state police power had profound professional and personal consequences. For those reasons, and for the broader institutional interests at stake, Amicus respectfully submits that the Court should enforce that boundary with precision and consistency. In support of the medical professional, Plaintiff-Appellee Dr. Amy Bryant, and in compliance with constitutional law argued by legislators Defendant-Appellants, Amicus Dant respectfully asks this Court to clarify that North Carolina's statutory framework must yield where it conflicts with federal law governing the safety, access, and administration of medication.

Respectfully Submitted, this the 27 day of April, 2026,

/s/ *Taylor Morgan Dant*
**Taylor Morgan Dant**, *esq.*
*Amicus Curiae.*

14

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(a)(5), this Brief comports with word limit and length requirements and is comprised of 15 pages, and 2530 words, and is 15 pages, word county excluding Cover Page, Table of Contents, Table of Authorities, and Certificate of Service. I further certify that the foregoing brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman font, a proportionally spaced typeface.

DATED: April 27, 2026

/s/ *Taylor Morgan Dant*
**Taylor Morgan Dant**, *esq*.
*Amicus Curiae.*

15

## CERTIFICATE OF SERVICE

On April 27, 2026, this brief was served via CM/ECF on all registered counsel

and transmitted to the Clerk of the Court.

DATED: April 27, 2026

/s/ *Taylor Morgan Dant*
**Taylor Morgan Dant**, *esq.*
*Amicus Curiae.*